Terence E. Timblin
**VERNIER & MAHER LLP**
115 Hesler Place
Ground Floor, Governor Joseph
 Flores Building
Hagåtña, Guam 96910
Telephone: (671) 477 7059
Facsimile: (671) 472-5487

**Attorney for Plaintiff**
KAIOH SUISAN CO., LTD.



# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| KAIOH SUISAN CO., LTD. | CIVIL CASE NO. 02-00021 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S TRIAL BRIEF; CERTIFICATE OF SERVICE** |
| GUAM YTK CORP., | |
| Defendant. | |

**COMES NOW,** Plaintiff KAIOH SUISAN CO., LTD. through counsel,

**VERNIER & MAHER, LLP,** by TERENCE E. TIMBLIN, pursuant to LR 16.7(b) and

presents its Trial Brief.

Plaintiff previously filed a Motion for Summary Judgment contending that it

was entitled to judgment based on the admissions in Defendant's Answer and the

parol evidence rule. The Court found that Defendant had raised material issues of

fact as to the parties' actual intentions with respect to the transaction in question.

Plaintiff submits that, at the very least, the admissions of Defendant establish

-1-

x

ORIGINAL

Plaintiff's case in chief, that is that the parties signed a written agreement by which Defendant borrowed One Hundred Million Japanese Yen (¥100,000,000) from Plaintiff, that Plaintiff transferred ¥100,000,000 to Defendant and that Defendant has failed to repay any of this amount according to the schedule set forth in the written agreement.

The points cited by the Court as raising a material issue of fact will be addressed separately.

## A. FACTUAL CONTENTIONS

Paragraphs 1, 2, 4, 5, and 6 of the Complaint alleging that the Court has jurisdiction over this matter; that the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00); that Defendant is a corporation organized, existing and doing business under the laws of Guam; that, on or about March 10, 2001, Plaintiff and Defendant entered into an Agreement by which Defendant borrowed ¥100,000,000 from Plaintiff; and that the actual transfer of the funds to Defendant was accomplished by way of two (2) wire transfers of Fifty Million Japanese Yen (¥50,000,000) through a corporate subsidiary of Plaintiff, have been admitted.

Paragraph 3, alleging that Plaintiff at all times relevant herein, is a foreign corporation organized and existing under the laws of Japan is denied on the basis of insufficient information. As noted in the Motion for Summary Judgment, Defendant has previously admitted the corporate existence of Plaintiff in Civil Case No. 02-00015. In addition, Defendant did not contest this issue in its Opposition to the Motion.

-2-

Paragraphs 7, 8, 9 and 10, alleging that, pursuant to the terms of the Agreement, Defendant was required to repay the loan in installments of Five Million Japanese Yen (¥5,000,000) at the end of each month beginning with January of 2002; that the Agreement further provides that Defendant shall pay interest of two percent (2%) per annum from the date of the transfer of the funds, to be calculated and paid after the final payment of principal is due; that, as of the end of July of 2002, Thirty-Five Million Japanese Yen (¥35,000,000) is due and payable and Defendant has failed and refused to pay any of this amount; and that additional installments will become due and payable prior to the entry of judgment, should Defendant fail and refuse to pay these, have been denied.

Plaintiff submits that these denials are of no force or effect, as the paragraphs denied simply reflect the terms of the Agreement, the existence of which Defendant has admitted, and the logical consequences of failing to comply with it.

Defendants asserts as a series of affirmative defenses that, "Notwithstanding the agreement attached to the Complaint", the transaction was not an actual loan, that Defendant's President, was deceived by the document as he does not read or write English, and that Plaintiff breached an alleged duty not set forth in the Agreement.

As further evidence that the transaction was a simple loan and nothing else, Plaintiff submits a letter written in Japanese on Defendant's letterhead and an English translation of the letter. **Exhibit A**. Copies of the letter and translation were submitted to Defendant's counsel on April 15, 2003 in anticipation of taking the deposition of Tom Kamiyama, the President of Defendant, with a request that he review the translation with Mr. Kamiyama and determine if he believes it to be accurate. **Exhibit B**. Counsel

-3-

was further requested to obtain his own translation if he did not believe it to be accurate. As of this writing, there has been no objection to the translation or an alternative translation provided.

The letter is addressed to Yoshiki Kuwahara (mistakenly spelled Kuwabara), the Chairman of the Board of Plaintiff. It purports to be signed by Mr. Kamiyama and the signature is similar to that on the Agreement attached to the Complaint, which has been admitted to be Mr. Kamiyama's. It reads, in part:

> In order for this project to start, it is necessary to show the government funds for the (new fishing port) rights and construction. Please forgive me for a personal request, hut I would like to borrow a sum of 100,000,000 in two installments. I will take responsibility to repay this amount. Furthermore, if necessary, I can provide assets that I own as collateral. I ask for your favor.

He requests installments of ¥50,000,000 each on December 5, 2000 and January 20, 2001, the same amounts and dates as stated in the Agreement. He promised a first repayment installment in March, 2001 (the letter actually says "2000" but, unless he was planning on repaying the loan before he received it, he must have meant 2001), the initial first installment date in the Agreement before it was crossed out and replaced with a handwritten "January, 2002". And the monthly installments were to be ¥5,000,000, the same as provided for in the Agreement.

Mr. Kamiyama was repeatedly asked during his deposition whether the signature on the Japanese version of the letter was his. His answers included: "I'm not sure"; "It probably – it may be but, you know"; "The way that this is signed, the way that the signature is done is the way my signature is written."; "If we're referring to the present way that I would do it, this would be my signature"; "It looks like my

-4-

signature."; and finally, "I can't say." Excerpt of Deposition Transcript of Tom T. Kamiyama, pages 26-28, hereinafter Tr. K, attached hereto.

The Court held in its Order that the terms "advance payment" and "tuna" in the applications for wire transfers create a material issue of fact. While Plaintiff maintains it's position that these terms are of no significance as the were addressed to the bank and not Defendant and in no way contradict the written Agreement, Plaintiff will offer testimony that these terms were there because Japanese law requires that some reason for the transfer must be stated in the application and that if the term "loan" had been used it would have required additional paperwork. See, Excerpt of Deposition Transcript of Shunsaku Yuasa, pages 22-24 and Excerpt of Continued Deposition Transcript of Shunsaku Yuasa, pages 26-28, attached hereto. In his letter requesting the loan, Mr. Kamiyama refers to "tuna fishing vessels" and that "a Tuna Forwarding company was established with your cooperation." Given that the basic purpose of the loan was to allow Defendant to engage in a business involving tuna, it is not a big surprise that the term "tuna" appeared on the applications.

Plaintiff's final factual contention is the lack of factual contentions on the part of Defendant. A claim that the transaction is not a loan does nothing to explain what it otherwise was.

## B. LEGAL BRIEF

### i. ISSUES OF LAW

For the same reasons set forth in the Motion for Summary Judgment, Plaintiff submits that 6 GCA §2511, the Guam parol evidence rule, precludes the use of

extrinsic evidence to vary or contradict the terms of the Agreement. Plaintiff adopts and incorporates the authorities set forth in the Motion as to this issue.

The Court found in its Order denying the Motion for Summary Judgment that Defendant's claim that Mr. Kamiyama did not understand the Agreement raises a material issue of fact. As pointed out in the Motion, ignorance of the contents of a contract expressed in a written instrument is no defense to liability. Plaintiff adopts and incorporates the authorities set forth in the Motion as to this issue. These authorities have not been distinguished, refuted or even addressed by either Defendant or the Court. Should the Court still regard this to be a material issue, Plaintiff would note that it was established in the deposition of Mr. Kamiyama that he has lived and done business on Guam since 1976. For him to have functioned in an English speaking society that long without achieving some fluency in English is highly unlikely. In addition, despite the fact an interpreter was employed, he answered one of this writer's first questions directly in English. Tr. K 9-10. His claim of ignorance is simply not credible.

The Court noted in its Order that the Agreement did not contain an integration or merger clause. As pointed out in the Motion, there is no requirement for such a clause either in §2511 or the common law rule.

The Court makes reference in the Order to the business license issue and correctly notes "it is unclear whether or not the plaintiff's only business (on Guam) is the 'loaning' of money to the defendant." The parties did, in fact, enter into a separate transaction by forming a Guam corporation known as Guam Kai Oh Co., Ltd. That venture did not go well either and resulted in litigation in this Court in Civil Case No.

-6-

02-00015 which has since been dismissed due to the loss of diversity and refiled in the Superior Court of Guam. The statement in the Reply to the Opposition to the Motion for Summary Judgment that the Plaintiff's only connection with Guam is the lending of money to a business on Guam was meant to convey that the lending of money was the only connection with respect to this transaction. The fact that the parties entered into another transaction does not create a business license defense as to this one.

First, the other transaction was the formation of a Guam corporation, which, in the now unlikely event that it ever has income, will be subject to and pay GRT. As noted by the Supreme Court of Guam in *EIE Guam Corporation v. Long Term Credit Bank of Japan*, 1998 Guam 6, 11 GCA § 70130(f) requires a court to "liberally construe subsections (b) through (e) of this Section in favor of . . . the business person and . . . ignore technical deficiencies if the courts find there has been substantial compliance with the business license laws, rules, and regulations and if the courts find that the landlord or business person has filed on a timely basis . . . gross receipts tax returns fully reporting all accountable revenues from the activity concerned for the periods in question . . . ." The primary purpose of the formation of the corporation was to lawfully do business on Guam and to comply with all legal requirements including the payment of taxes.

Second, the only reason that there was no business license is that Mr. Kamiyama, the President of Guam Kai Oh Co., Ltd., failed to obtain one. He was the "local partner" who had been doing business on Guam since 1976 and Plaintiff reasonably relied on him to comply with all local requirements such as obtaining a business license. He well knew that a business license was required because he had

-7-

obtained one for Guam YTK Corporation. Tr. K 12-13. He was able to accomplish the incorporation of Guam Kai Oh Co., Ltd. and he admitted in his deposition that he could have obtained a business license at any time. Tr. K 39-42. He is hardly entitled to complain about the absence of a business license that he should have obtained in the first place.

And third, 11 GCA § 70130(g) provides that the failure of one party to have a business license shall be an affirmative defense by any other party. Defendant has failed to plead the lack of a business license as an affirmative defense and it is now waived.

Where Plaintiff intended to do business on Guam, it took reasonable steps to comply with local tax law. Where it did not intend to do business on Guam it was not required to comply with local tax law. As held in the *EIE* case, the loaning of money to a company on Guam by an off-Island entity does not constitute doing business on Guam. In any event, the existence of the lack of a business license is only an issue in "Guam courts". As this Court is a creature of the United States Congress rather than the Legislature of Guam, Plaintiff submits that this is not a "Guam court".

Plaintiff submits that damages should be awarded as set forth in the Motion for Summary Judgment.


## ii. EVIDENTIARY PROBLEMS

As noted above, any evidence offered by Defendant of terms other than the contents of the written Agreement is barred by 6 GCA §2511.

-8-

## C. ATTORNEY'S FEES

Plaintiff submits that there is no basis for the recovery of attorney's fees by either party.

## D. ABANDONMENT OF ISSUES

No issue has been abandoned by Plaintiff.

Dated this 29th day of July, 2003.

**VERNIER & MAHER, LLP**
Attorney for Plaintiff
**KAIOH SUISAN CO., LTD.**

By: _____
        TERENCE E. TIMBLIN

## CERTIFICATE OF SERVICE

I, **TERENCE E. TIMBLIN**, hereby certify that on the 29th day of July, 2003, I caused a copy of the annexed **PLAINTIFF'S TRIAL BRIEF** to be served upon Defendant, by delivering and leaving a copy of same to their attorney of record, as follows:

**Phillip Torres**
**TEKER CIVILLE TORRES & TANG, PLLC**
**Suite 200, 330 Hernan Cortez Avenue**
**Hagåtña, Guam 96910**

Dated this 29th day of July, 2003.

**VERNIER & MAHER, LLP**
**Attorneys for Plaintiff**
**KAIOH SUISAN CO., LTD.**

BY: _____
**TERENCE E. TIMBLIN**

\\Valerie\c\MarieBackup\My Documents\CLIENTS (NON-GIA)\KAIOH SUISAN CO. LTD\Kaioh v Guam YTK - USDC CVA02-00021\Pleadings\Trial brief 071703.doc

-10-



# Guam YTK Corporation
### General Development Industry
P.O. BOX 24134
GMF, GUAM 96921 U.S.A.
PHONE: 649-6961 • FAX: (671) 649-7520
Y.T.K. Marine Products

海王水産株式会社

　桑原　芳樹　様

先般は　お忙しい中　グアムまでお越しいただきありがとうございました。貴殿ご視察のとおり現在グアムは日本及び台湾のまぐろ船の日本への中継基地として発展しつつあります。私共もグアム政府よりやっと漁港（ホテルワーフ）の使用リース権を得てその準備に入っております。　幸運にも鳴島氏の紹介で貴海王水産、桑原会長　および　湯浅社長とお会いする事ができ、又、まぐろ出荷会社を貴社のご協力を得て設立する事が出来、私の念願であったこの仕事もどうにか先が見える様になりました。現在、新しくまぐろの水揚げ場所になる　ホテルワーフ　に仮説の事務所と作業場を作るべく準備しております。今月中には出来上がる予定です。　今後は海王水産と一緒にこのプロジェクトを成功させる為にがんばっていく決意です。

ホテルワーフ（新漁港）の政府との本契約の条件も詰めており、諸条件合意の元で無事契約できると思います。

本プロジェクトをスタートする為に政府に対しての権利金および建設準備金の用意を示す必要があり、大変勝手申して申し訳ありませ

**Exhibit**

**A**

んが、準備金として一億円を 2 回に分けてお借りしたくお願い申し

上げます。この金額に対しては私が責任をもってご返済いたします。

又、必要であれば、私の持っている資産を担保として提出できます。

よろしくお願いいたします。

資金必要月/日

    第1回　2000 年 12 月 5 日　　　5000 万円

    第2回　2000 年 1 月 20 日　　　5000 万円

                  計　　一億円

借入金返済計画

    第1回　2000 年 3 月より

  金*500* 万円を毎月末日までにご返済いたします。又、銀行借

入 及び、その他業者からの権利金が得られた時は残金を一括し

てご返済いたします。ぜひともご協力の程よろしくお願いします。

Guam YTK Corporation

Tom T Kamiyama

# *Guam YTK Corporation*

**General Development Industry**
**P.O. BOX 24134**
**GMF, GUAM 96921 U.S.A.**
**Phone: 649-6961  Fax: (671) 649-7520**
**Y.T.K. Marine Products**

Kaio Suisan Co., Ltd.

Mr. Yoshiki Kuwabara

Thank you for visiting Guam recently despite your busy schedule.   As per your inspection, Guam has the capability to develop into a port of transfer to Japan for Japanese and Taiwanese tuna fishing vessels. I have finally acquired the lease rights to use a fishing port (Hotel Wharf) from the government, and am presently making those preparations.  I had the good fortune through Mr. Narushima of being introduced to Kaio Suisan, Chairman Kuwabara, and [the] President Mr. Yuwasa. Also, a Tuna Forwarding company was established with your company's cooperation. It seems that my heart's wish for this work is in sight.  Presently the necessary preparations are being made for a temporary office and work area at the future fish off-loading site at Hotel Wharf. Completion is scheduled to be within this month. I have determined to work hard with Kaio Suisan to succeed with this project.   The conditions of the contract with the Government for Hotel Wharf (new fishing port) are also being put together, and I believe that through the agreement of the various conditions that a contract can be concluded.

In order for this project to start, it is necessary to show the government funds for the [new fishing port] rights and construction.  Please forgive me for a personal request, but I would like to borrow a sum of 100,000,000 in two installments. I will take responsibility to repay this amount. Furthermore, if necessary, I can provide assets that I own as collateral. I ask for your favor.

Necessary Dates for Funds

| | | |
|---|---|---|
| First payment: | December 5, 2000 | 50,000,000 Yen |
| Second payment: | January 20, 2001 | 50,000,000 Yen |
| | Total: | 100,000,000 Yen |

Plan for Repayment of Loan:

First payment:       From March 2000

an amount of 5,000,000 will be repaid at the end of each month. Also, once a bank loan and the payment by other companies for the rights are received, the remaining balance [of the loan] will be repaid in one lump sum payment. I request for your cooperation.

Guam YTK Corporation

_____

Tom T. Kamiyama

Certificate of Translation
I, Tamio S Clark, a duly approved translator and interpreter
with the Superior Court and District Court of Guam, do hereby
certify that the above document (two pages total) was translated
by me to the best of my ability.

Tamio S. Clark

FRANCIS M. MCKEOWN
D. PAUL VERNIER, JR.**
JOHN G. PRICE*
JOHN B. MAHER**
COLIN C. MUNRO*
LOUIE J. YANZA**
MICHAEL D. FLYNN, JR.
THOMAS S. CLIFTON*
TERENCE E. TIMBLIN**
JEANINE M. LARREA*

*ADMITTED IN CA
**ADMITTED IN GUAM



**McKEOWN • VERNIER • PRICE • MAHER**
ATTORNEYS AT LAW
A Joint Venture of McKeown Price, LLP
and Vernier & Maher, LLP

115 HESLER PLACE
GROUND FLOOR
GOV. JOSEPH FLORES BLDG.
HAGÅTÑA, GUAM 96910-5004
TELEPHONE 671-477-7059
FACSIMILE 671-472-5487
www.mckeownlaw.com
E-MAIL vernier@ite.net

April 15, 2003

<u>**VIA FACSIMILE – 472-2601**</u>

Mr. Phillip Torres
**TEKER CIVILLE TORRES & TORRES, PLLC**
Suite 200, 330 Hernan Cortez Avenue
Hagatna, Guam 96910

RE:   **KAIOH SUISAN CO., LTD. v. TOM T. KAMIYAMA, ET AL.**
     <u>**Superior Court of Guam Civil Case No. CV1837-02**</u>

          - and -

     **KAIOH SUISAN CO., LTD. v. GUAM YTK CORP.**
     <u>**United States District Court Civil Case No. CV02-00021**</u>

Dear Phil:

Enclosed is a copy of a two-page letter written in Japanese on the letterhead of the Guam YTK Corporation and purportedly signed by Tom Kamiyama, as well as an English translation of the letter performed by Tamio S. Clark. I intend to explore this letter during Mr. Kamiyama's deposition. In order to avoid needless delay during the deposition, I request that you review the translation with Mr. Kamiyama and determine if he believes it to be accurate. If he does not believe it to be accurate, I request that you have your own translation performed and provide it to me prior to the deposition.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

**McKEOWN • VERNIER • PRICE • MAHER**

Terence E. Timblin

Enclosure
cc: Mr. Shunsaku Yuasa
    Allen D. Clark

\\Valerie\c\MarieBackup\My Documents\CLIENTS (NON-GIA)\KAIOH SUISAN CO. LTD\Kaioh Suisan v Tom Kamiyama, et al -
CV1837-02\Correspondence\Torres 041503.doc

# SUPERIOR COURT OF GUAM

KAIOH SUISAN CO., LTD., and )    Civil Case No. CV1837-02
GUAM KAI OH CO., LTD., )
                    )
          Plaintiffs, )
                    )
     vs. )
                    )
TOM T. KAMIYAMA, YOSHIE M. )
KAMIYAMA and GUAM YTK CORP., )
                    )
          Defendants. )

◻ COPY

RECEIVED

McKEOWN . VERNIER.
PRICE. MAHER
DATE: ___6/19/03___
TIME: ___11:43 a.m.___
BY: ___JMC___

## DEPOSITION OF **TOM T. KAMIYAMA**

Taken on Behalf of the Plaintiffs

BE IT REMEMBERED That pursuant to the Guam
Rules of Civil Procedure, the deposition of **TOM T. KAMIYAMA**
was taken before Cecille A. Flores, a Certified Shorthand
Reporter, on Friday, the 25th day of April 2003, in the law
offices of McKeown, Vernier, Price & Maher, Ground Floor,
Gov. Joseph Flores Bldg., 115 Hesler Place, Hagatna, Guam, at
the hour of 10:00 a.m.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
(671) 688-1041 * Fax (671) 633-3353

Case 1:02-cv-00021  Document 419  Filed 07/29/2003  Page 16 of 34

1    A    Yes.

2    Q    When did you get married?

3    A    I've been involved with so much business and I've

4    gotten old, I think it was in 1978.

5         (In English)  Yes.

6         (Through Translator) I have proof of that, it's just

7    that it hasn't sinked into my memory.  In Japan -- there's

8    one more thing that needs to be known.  None like the US, we

9    only remember the year of the marriage rather than like in

10   the United States.

11   Q    Otherwise, you're going to be in big trouble.

12   A    I would have to say one more thing that I needed to.

13   During my era, it was a period that was very similar to

14   something like how Iran is very, very strict.  And it was

15   just required -- or the only thing -- we don't remember

16   details, we just remember -- for example, the year.

17             MR. TORRES:  Can we go off the record for a

18   minute?

19                         (Recess taken.)

20   BY MR. TIMBLIN:  (Continuing)

21   Q    Mr. Kamiyama, when did you first come to Guam?

22   A    (In English) 1976.

23   Q    Sir, you just answered my question directly rather

24   than through the interpreter.  Roughly how much English do

25   you understand?

Tom T. Kamiyama: April 25, 2003

1    A    I can understand simple questions like what you just

2    asked, but for example, English writing, I do not understand.

3    Q    Well, I would ask you to wait until I ask the

4    question and the translator translates it and then listen to

5    the translator and then respond through the translator rather

6    than directly to me, otherwise we're going to have a lot of

7    confusion.

8    A    (Witness nodded head.)

9    Q    What was your purpose in coming to Guam?

10   A    For business.

11   Q    What kind of business?

12   A    At first it was for construction.

13   Q    How many years, say from 1976 until when, were you

14   in construction?

15   A    Up until the present time.

16   Q    You were engaging in construction until this day?

17   A    Yes, I continue in construction whenever I have an

18   order.

19   Q    What's the name of your construction company?

20   A    Guam YTK Corporation.

21   Q    So Guam YTK does construction as well as apparently

22   the fishing business; is that correct?

23   A    Yes.

24   Q    Does Guam YTK do anything else besides construction

25   and the fishing business?

Tom T. Kamiyama: April 25, 2003

1       A     I need to take a look at that.

2       Q     What percentage of shares are owned by you?

3       A     I think around 60 percent.

4       Q     What percentage is owned by your wife?

5       A     I'm not sure, but around 30 percent.

6       Q     So then that leaves roughly 10 percent owned by

7  Mr. Kamiseido?

8       A     Yes.

9       Q     Does Mr. Kamiseido live on the island or in Japan or

10  someplace else?

11      A     In Japan.

12      Q     The answer is, in Japan?

13            **TRANSLATOR:** In Japan.

14      Q     When you formed Guam YTK, did you obtain a Guam

15  business license for it?

16      A     Within one week thereafter, and that is needless to

17  say that it is something that needs to be done.

18      Q     When you first formed the corporation in 1978, you

19  got a business license and every year since then you've

20  renewed the business license?

21      A     Yes.

22      Q     Have you always paid the gross receipts tax on your

23  business?

24      A     Of course.  You would not be able to renew your

25  license without paying the GRT.

Tom T. Kamiyama: April 25, 2003

1      Q    So you understand that anybody that wants to conduct

2   business on Guam has to have a business license?

3           MR. TORRES:  Objection to the extent that it

4   calls for a legal conclusion.  You can answer if you can

5   answer.

6      A    I'm sorry, can you repeat the question?

7   BY MR. TIMBLIN: (Continuing)

8      Q    Do you understand that anybody that wishes to engage

9   in business on Guam must have a business license?

10     A    Yes, I do understand that.  However, I have one

11  thing to say.  One thing I have to say is that when

12  establishing a corporation, there has to be a clear, defined

13  purpose of what you want to do, otherwise, getting a business

14  license makes -- doesn't have any meaning without that

15  defined purpose.

16     Q    Back in November of 2000, could you tell us exactly

17  what happened that you decided to get into the fishing

18  business?

19     A    Because I have done fishing business in Okinawa

20  before.  And in order to add to the business for YTK, I got

21  involved in the fishing business.  And would you mind if I

22  add more to that?  Before that, my brother-in-law sent to me

23  a fishing vessel.

24     Q    When you say you were doing the fishing business in

25  Okinawa, when was that?

Tom T. Kamiyama: April 25, 2003

1   Q    Was that your understanding about what that document

2   meant or did you think it was something else?

3   A    I had no -- absolutely no understanding that that

4   meant that I was borrowing money.

5   Q    Who gave you this document to sign, if you remember?

6   A    Three of the individuals, Mr. Narushima, the

7   Chairman, and the President came together at that time.

8   Q    Did you ask him what this meant before you signed

9   it?

10  A    I thought it was just a division of shares, but I

11  had no idea that it meant we were borrowing money.

12  Q    But my question is, did you ask these people what

13  this document meant before you signed it?

14  A    No.

15          MR. TIMBLIN:   Could you mark this as 3A and 3B?

16                         (Exhibit 3A and 3B marked for

17                          identification: Japanese and

18                          English letter from Mr. Kamiyama

19                          to Mr. Kuwabara.)

20          MR. TIMBLIN:   We're starting with Exhibit 3A

21  which is the document on the Guam YTK Corporation letterhead

22  written in Japanese characters, and then Exhibit 3B is what

23  purports to be a translation of the same document in English.

24  And I would ask the translator, did you in fact translate

25  Exhibit 3A into 3B?

1        TRANSLATOR:  Yes, I did.

2        MR. TIMBLIN:  Is that true and correct to the

3   best of your ability?

4        TRANSLATOR:  To the best of my ability, yes, it

5   is.

6        MR. TIMBLIN:  Do you regard that as accurate?

7        TRANSLATOR:  As accurate as possible, yes.

8        MR. TORRES:  Before you ask questions, I want to

9   interpose my objection on the record rather than simply voir

10  dire.  We were provided with a translated copy on April the

11  18th, my office was, and I have not had a chance to get an

12  independent translation.  I have no objections proceeding

13  with questions upon the document subject to foundation.

14       MR. TIMBLIN:  Thank you.

15  BY MR. TIMBLIN: (Continuing)

16   Q    I'll show you what's been marked as Exhibit 3A.

17  First of all, is this your signature on Page 2?

18   A    I'm not sure because I don't remember borrowing -- I

19  don't remember borrowing a Hundred Million Dollars -- a

20  Hundred Million Yen, I'm sorry.

21   Q    The question is, is that your signature on the

22  second page of that document?

23   A    It probably -- it may be but, you know,

24  Mr. Narushima -- it's like an original.  You know,

25  Mr. Narushima could have done something to -- something with

Tom T. Kamiyama: April 25, 2003

1   the signature.

2            MR. TORRES:   I'd like to interpose another

3   objection on the best evidence regarding use of this copy.

4   BY MR. TIMBLIN: (Continuing)

5       Q    Regardless of what Mr. Narushima may or may not have

6   done, is that your signature on the document?

7       A    The way that this is signed, the way that the

8   signature is done is the way my signature is written.   But

9   the contents of this never made a document like this.   There

10  is no type like this here.

11      Q    One last time, is that your signature on that

12  document regardless of who put the other words there?

13      A    If we're referring to the present way that I would

14  do it, this would be my signature.

15      Q    So that is in fact your signature?

16      A    This -- I don't know.

17      Q    Are you denying that --

18      A    It looks like my signature.

19      Q    Do you deny that it is your signature?

20      A    I can't say.

21      Q    Your answer is that you do not know whether or not

22  that is your signature?

23      A    Yeah, that's all I can say.

24      Q    On the first page of the document, is this the Guam

25  YTK letterhead?

Tom T. Kamiyama: April 25, 2003

1  like the containers -- there is also air conditioners and

2  stuff like that -- any item paid by these checks belongs to

3  the Guam Kaioh Corporation; is that correct?

4      A     What was originally planned was that the money that

5  was to be used -- the Guam Kaioh Suisan money to be used, but

6  because they did not have a business license, the plan was

7  that eventually it would become Guam Kaioh Suisan items.

8      Q     So my question then is, do you regard this property

9  right now to be the property of Guam Kaioh?

10     A     These are the -- these are the items of both YTK and

11  Guam Kaioh Suisan.  And the reason is because prior to that,

12  YTK had leased these offices prior to Kaioh Suisan.

13     Q     So is your answer that it belongs to both Guam Kaioh

14  and Guam YTK?

15     A     At this present time, there is no other way to look

16  at it than that.  The reason for that is -- and this is also

17  in understanding between all the gentlemen, Mr. Narushima,

18  and the President that understood that there was a sign that

19  was prepared that was supposed to have Kaioh Suisan's name on

20  it eventually.  And once it became -- once everything -- a

21  license was received, then immediately Kaioh Suisan's name

22  would be on the name tag.

23     Q     Now, you're saying that you never got a business

24  license for Guam Kaioh; is that correct?

25     A     No.  Yes, no license.  And I just said that earlier;

Tom T. Kamiyama: April 25, 2003

1  right? I told you earlier that there was no license.

2      Q    I'm just making sure. So why did you not get a

3  license for Guam Kaioh?

4      A    Now you're asking the same question again. Because

5  as I mentioned, their understanding -- they're supposed to

6  get 20 to 25 vessels that were supposed to be prepared by

7  Kaioh Suisan. Until that is done, what purpose or what

8  reason are we going to be getting a business license for

9  without that? That's why I'm saying --

10     Q    You indicated before you understand you need a

11 license to do business on Guam; is that correct?

12     A    When you're going to start your business and begin

13 operations. For example, in my case, I was ready to start

14 construction immediately after establishing my company,

15 that's why we got a business license.

16     Q    So you didn't think you needed a business license

17 until you actually started doing business; is that correct?

18     A    No, this was their understanding. They knew

19 originally that -- I introduced them to the Port Authority

20 saying that their business could begin or that they would be

21 getting a license once they had provided their 20 to 25

22 vessels.

23     Q    Was there anything preventing you from simply

24 getting a business license whether you got the vessels or

25 not?

Tom T. Kamiyama: April 25, 2003

1      A     No.  However, what I'm saying is that how would we
2   do business without them providing the vessels?
3      Q     That's not the question.  The question is, was there
4   anything preventing you from simply getting a Guam business
5   regardless of these vessels?
6      A     No, no reason at all.  I was waiting for them -- I
7   was waiting for them to come out.  That's why I opened up a
8   big space for them.
9      Q     So it was your decision, then, not to get a business
10  license even though you could have?
11     A     This is not my decision, as I told Mr. Narushima
12  before.  Mr. Narushima was -- Mr. Narushima is the one who
13  handled everything for Kaioh Suisan.  In essence, really,
14  Kaioh Suisan didn't know precisely what was going on.  As I
15  mentioned on the first meeting that we had, he said -- I told
16  Mr. Narushima that I've been away from Japan for almost 20
17  years, so I don't know what the -- how things are done in
18  Japan.  And Mr. Narushima told me, no, Tom, don't worry, you
19  leave Japan side up to me is what Mr. Narushima told me.
20     Q     So basically, Mr. Narushima was leaving the Guam
21  side up to you, wasn't he?
22     A     Mr. Narushima said, just for the time being, operate
23  the business under YTK, is what Mr. Narushima said.
24     Q     But he didn't tell you not to get a business
25  license, did he?

Tom T. Kamiyama: April 25, 2003

1    A    No, this is what I told him.

2    Q    So basically, my question again is that it was your

3    decision not to get a business license until later when you

4    started doing business; is that correct?

5    A    This is not a decision made on my own.  This

6    decision was made in discussion with Mr. Narushima.

7    Q    But Mr. Narushima did not say, don't get a business

8    license, did he?

9    A    No, he didn't.

10   Q    So again, it was your decision to not get a business

11   license?

12   A    Yes, because I am the one representing, I did not

13   make the application.

14   Q    Tell him that until we ask a question, he is not to

15   say anything.  Moving on to Exhibit 7 now.  Mr. Kamiyama,

16   this is dealing now with the 100,000,000 Yen case.  And

17   again, I believe Mr. Torres asked you to provide him with

18   copies of all the checks that you spent with this money.  Do

19   you recall that?

20   A    Yes, I remember.  And I gave everything that I had

21   to him.

22   Q    For the record --

23   A    I have -- I'm not like Mr. Narushima to have

24   anything hidden or any devious plan.  I'm a straight type of

25   person.  What I have, I've given.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| KAIOH SUISAN CO., LTD., | ) CASE NO. 02-00021 |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GUAM YTK CORPORATION, | ) |
| | ) |
| Defendant. | ) |

---

**DEPOSITION UPON ORAL EXAMINATION
KAIOH SUISAN CO., LTD.
through its designated representative
SHUNSAKU YUASA**

---

PLEASE TAKE NOTICE that on Thursday, May 21st, 2003, at 1:50 p.m., at the Law Offices of TEKER CIVILLE TORRES & TANG, PLLC, Suite 200, 300 Hernan Cortez Avenue, Hagatna, Guam 96910, the deposition of **Kaioh Suisan Co., LTD.,** through its designated representative, **SHUNSAKU YUASA**, was taken upon oral examination pursuant to Notice of Deposition.

# COPY

1    Q   Did they say that they had ships, that they

2 personally had ships?

3    A   In my -- yes, this -- ships?

4    Q   Boats.

5    A   Boats, vessels, yes.

6    Q   Vessels.

7    A   Vessels, in my knowledge, we transfer the

8 hundred million, and by using this hundred million,

9 they purchase this vessel, Oryo Maru.

10    Q   Okay.

11    A   Without using for the, the deposit for the

12 government.  I'm not too sure, you know.

13    Q   When Japan Russia Marine Products Company

14 sent this money on your behalf; did you have to sign a

15 loan with them?

16    A   Oh, no, this one is just, as I told you,

17 application for the bank.

18    Q   But the money that's coming in here, is this

19 your money?

20    A   Of course our money.

21    Q   And does it come out of your company, or did

22 you get a bank loan for this?

23    A   Of course, as I told you, Japru is a

24 subsidiary company, so Kaioh Suisan transferred money,

25 Japru transferred money.

Pramila D. Sullivan
414 West Soledad Avenue, Suite 501 F
Hagatna, GU 96910
Pramila@netpci.com  Phone 477-1389, 477-1077, Cell 687-6600

1    Q    So Kaioh Suisan never had to take out a loan
2  to send the 200,000 or the one million?

3    A    No.

4    Q    Do you know why this is advance payment for
5  tuna?

6    A    You know, the bank, we have to put some words
7  when we transfer the money in Japan according to the
8  regulations.    So advance payment or purchase or
9  something or, you know, so this is it.    I instructed
10  to put the word advance payment.    Advance payment is
11  easy to get permission from the bank.

12    Q    So if you put down that I'm loaning them
13  money, would that be a problem?

14    A    You mean --

15    Q    If it said loan to Guam Kaioh?

16    A    No, no, no, but this just for the purpose of,
17  for sending the money, permission to get the
18  permission of the bank.    So this is nothing to do with
19  the loan agreement, just application to transfer the
20  money, the way of transferring the money.    So don't --
21  this is just -- this doesn't connect with loan
22  agreement.

23    Q    I know.

24    A    Yeah.

25    Q    I know, but my question is what if you had

Pramila D. Sullivan
414 West Soledad Avenue, Suite 501 F
Hagatna, GU 96910
Pramila@netpci.com  Phone 477-1389, 477-1077, Cell 687-6600

Case 1:02-cv-00021    Document 19    Filed 07/29/2003    Page 30 of 34

1  written down loan to Kamiyama?

2      A    Loan, never.  If we put the loan, we have

3  another very complicated procedure; I mean the

4  permission from the national bank or something.  So

5  it's very easy way, two ways, purchase a product easy,

6  advance payment easy.  But loan, in order to make some

7  loan, we have another -- we must get another

8  permission from the government.

9      Q    Okay.

10      A    So that's why, you know, and also this one,

11  200,000, also we need permission, investment,

12  permission.  That's why we transferred from United

13  States.

14      Q    This is Exhibit 5.  This is your agreement on

15  the 100 million yen?

16      A    Yeah.

17      Q    And who wrote that agreement?

18      A    I instructed, and my staff typed.

19      Q    Because it looks very much like this

20  agreement.

21      A    Uh-huh.

22      Q    And when I say "this agreement," I referred

23  to Exhibit 2.

24      **THE WITNESS**:  This is my signature.

25      Q    Do you know -- so you met with them or did

Pramila D. Sullivan
414 West Soledad Avenue, Suite 501 F
Hagatna, GU 96910
Pramila@netpci.com  Phone  477-1389, 477-1077,  Cell 687-6600

Case 1:02-cv-00021    Document 19    Filed 07/29/2003    Page 31 of 34

# IN THE DISTRICT COURT OF GUAM

KAIOH SUISAN CO., LTD.,          )   CASE NO. 02-00021
                    )
           Plaintiff,   )
                    )
     vs.                )
                    )
GUAM YTK CORPORATION,       )
                    )
           Defendant.   )

---

**CONTINUING DEPOSITION UPON ORAL EXAMINATION
KAIOH SUISAN CO., LTD.
through its designated representative
SHUNSAKU YUASA**

---

PLEASE TAKE NOTICE that on Wednesday, June 11th, 2003, at 9:45 a.m., at the Law Offices of TEKER CIVILLE TORRES & TANG, PLLC, Suite 200, 300 Hernan Cortez Avenue, Hagatna, Guam 96910, the continuing deposition of **Kaioh Suisan Co., LTD.**, through its designated representative, **SHUNSAKU YUASA**, was taken upon oral examination pursuant to Notice of Deposition.

RECEIVED **COPY**

McKEOWN . VERNIER .
PRICE . MAHER
DATE: 6/23/03
TIME: 3:47 PM
BY: NM .

1    A    Uh-huh.

2    Q    So you were explaining that the transfer is

3  illegal, but you also in your previous deposition were

4  explaining that the reason you put advance payment for

5  tuna was because it would be much more difficult.

6    A    You are still sticking to advance payment?

7    Q    Well, no.  You explained at your deposition

8  that you had Japan Merchant Marine send this money,

9  and that the reason it says advance payment and not

10  loan is because you would have to get special

11  permission or something.

12    A    That's right, that's right.  It's a little

13  more difficult, you know, so the advance payment is

14  easier to get permission to transfer the money.

15    Q    Who would you have to get permission from?

16    A    In case of loan?

17    Q    Yes.

18    A    Loan is Japanese Minister of Finance, and

19  also the Japan bank, the national bank.

20    Q    Is that a lengthy process?  Is that --

21    A    We need many papers to show the scheme or

22  everything.

23    Q    And does that cost money also?

24    A    Huh?

25    Q    Is there a charge, a fee to do that?

Pramila D. Sullivan
414 West Soledad Avenue, Suite 501 F
Hagatna, GU 96910
Pramila@netpci.com Phone  477-1389, Fax 477-1077,  Cell 687-6600

Case 1:02-cv-00021     Document 19     Filed 07/29/2003     Page 33 of 34

E
X
H
I
B
I
T
S

1    A    No, no charge, no charge but we must prepare

2  the -- and this is so urgent, so it's easy.

3    Q    Okay.

4    A    This is easy, just we will transfer the money

5  quickly, you know.

6    Q    And you said that you never received any

7  reports as to how the one million was being spent.

8    A    No, never.

9    Q    And did you ask for any reports?

10    A    Of course myself I never ask, so always --

11    Q    Through your staff.

12    A    Through my staff because this is -- yeah.

13    Q    What I don't understand is sometimes I ask my

14  staff to do things.  For example, I called your

15  attorney yesterday or I said, "Please call your

16  attorney and say we're going to change the time from

17  9:00 to 9:30."  Now if they call and leave a message,

18  they haven't accomplished what I asked them to do, and

19  of course if you show up at 9:00 o'clock, you didn't

20  know any differently.

21    A    No.

22    Q    So I get upset when they just leave a message

23  because they haven't done -- they have to do more than

24  that.  So when you send your staff over here to say,

25  "I want to know how this money is being spent," and

Pramila D. Sullivan
414 West Soledad Avenue, Suite 501 F
Hagatna, GU 96910
Pramila@netpci.com Phone  477-1389, Fax 477-1077,  Cell 687-6600

Case 1:02-cv-00021    Document 18    Filed 07/29/2003    Page 34 of 34

E
X
H
I
B
I
T
S